312 Ga. 224
FINAL COPY

S21A0709. THORNTON v. THE STATE.

PETERSON, Justice.

William Denzel Thornton appeals his convictions for malice murder, armed robbery, and possession of a knife during the commission of a felony in connection with the stabbing death of Jullisa Cooke.[1] Thornton argues that the evidence was insufficient to support his armed robbery conviction; the trial court made evidentiary errors by admitting a 911 call and testimony regarding bloodstain pattern analysis; and the trial court erred in denying his

---

[1] The crimes occurred on January 10, 2017. In February 2017, a Carroll County grand jury indicted Thornton for malice murder, felony murder, armed robbery, aggravated battery, and possession of a knife during the commission of a felony. At a March 2018 trial, a jury found Thornton guilty on all counts. The trial court sentenced Thornton to life in prison without the possibility of parole for malice murder, a concurrent life sentence for armed robbery, and a five-year consecutive term for the knife-possession charge; the remaining counts were vacated by operation of law or merged for sentencing purposes. Thornton filed a timely motion for new trial, which he later amended. Following a hearing, the trial court denied Thornton's motion for new trial. Thornton timely appealed; his case was docketed to this Court's April 2021 term and submitted for a decision on the briefs.

request for a continuance, made during trial, so he could attempt to access potentially exculpatory evidence on Cooke's Facebook account. We affirm because the evidence was sufficient for the jury to conclude that Thornton was guilty of armed robbery; the trial court's evidentiary errors, if any, were harmless; and Thornton has failed to establish that the trial court erred in denying his request for a continuance.

Viewed in the light most favorable to the jury's verdicts, the trial evidence showed the following. In January 2017, Cooke was living with her aunt and uncle, Gail and Kimani Kimathi, in Carroll County. Thornton lived with Eddie and Courtney Ford. In early January, Cooke and Thornton broke up after dating for most of 2016. Prior to breaking up, Thornton had become upset because Cooke's ex-boyfriend, Trey, had contacted her, and Thornton believed Cooke was encouraging Trey to call her. Trey had been physically abusive toward Cooke when they dated a few years prior.

Thornton asked Cooke to resume their relationship, but she refused and thereafter blocked Thornton from being able to call or

text her. Thornton sent Gail text messages in an attempt to talk to Cooke. Gail responded that Cooke said that she did not want Thornton calling her. Cooke confided in Gail that Thornton had been abusive during their relationship.

On the morning of January 10, 2017, several neighbors saw a white, older-model Mercedes car with body damage parked in the street near Cooke's house. Thornton drove such a car, and the body damage on the car observed that morning was consistent with body damage on Thornton's car. One neighbor, Lynette Daniel, saw Thornton ringing Daniel's doorbell several times, at one point jumping up and down. She also saw him wearing a tan or beige hooded sweatshirt and carrying something in his hands while walking between her home and the Kimathi residence. Daniel called Cooke to let her know that Thornton was outside and appeared to be agitated. Cooke replied that she was rushing to get to work and would talk to Thornton once she got outside.

Cooke's sister, who lived next door with Daniel, also heard the doorbell ring and saw Thornton's white Mercedes parked outside.

3

Cooke's sister said that the car was gone by 8:05 a.m. Around this time, Thornton called Eddie to ask if Eddie was home, and Thornton returned home sometime later that morning.

Around 9:00 a.m., Kimani was leaving his house for work when he saw an envelope on the ground near the driver's side of Cooke's car. After he bent down to see if anything else had blown under the car, he saw Cooke slumped over in her car and blood spattered on the inside of the passenger side door. Kimani called 911. Meanwhile, Daniel looked for a pulse and found no signs of life from Cooke. An autopsy revealed that Cooke had been stabbed 55 times, and that stab wounds penetrated multiple organs, leading to her death.

While police officers were on the scene, Daniel received two video calls from Cooke's cell phone. Police realized that Cooke's phone was missing and directed Daniel not to answer the calls; the police believed Cooke's killer had the phone and feared the killer would realize the police had been called and destroy the phone, ending any ability to locate it. Police officers then went to the townhome complex where Thornton was residing to search for

4

Cooke's cell phone. Police officers began looking inside dumpsters outside the complex, called the phone, and heard Cooke's cell phone vibrate from inside a trash bag.

The officers retrieved the cell phone, which had a shattered screen, and also found inside the trash bag a gray hooded sweatshirt with a large amount of blood on it, gray sweatpants, a pair of bloody gloves, a knife with blood on the blade, and paper towels. A DNA analysis revealed the presence of Cooke's DNA on the knife, the gloves, and the sweatshirt. Cooke's stab wounds were consistent with being stabbed with the recovered knife. Courtney testified that the recovered sweatshirt, which had buttons at the top, was similar to the type of sweatshirt Thornton wore. The pair of gloves were the type issued to Thornton by his employer. Additionally, the paper towels found in the trash bag had a pattern consistent with the kind found inside Thornton's residence.

1. Thornton does not challenge the sufficiency of the evidence related to his murder or knife-possession convictions, but he does argue that the evidence was insufficient to support his armed

robbery conviction. Thornton was charged with taking Cooke's cell phone by the use of a knife, and he argues that there was no evidence showing when or how Thornton obtained the cell phone, meaning there were various possibilities as to how he came to possess the phone that did not involve armed robbery. We disagree because the jury was entitled to reject these other possibilities and find him guilty of armed robbery.

When evaluating the sufficiency of evidence as a matter of federal due process under the Fourteenth Amendment to the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Under that standard, we view the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citation and punctuation omitted).

Under Georgia law, "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]" OCGA § 16-8-41 (a). To convict Thornton, the State had to prove that his use of the knife occurred prior to or contemporaneously with the taking of Cooke's cell phone. See *Bates v. State*, 293 Ga. 855, 857 (2) (750 SE2d 323) (2013); *Fox v. State*, 289 Ga. 34, 36 (1) (b) (709 SE2d 202) (2011).

Because there is no direct evidence that Thornton committed the armed robbery, to sustain his conviction based on circumstantial evidence, the evidence must be "consistent with the hypothesis of guilt" and "exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. But not every hypothesis is reasonable, and it is for the jury to determine whether an alternative hypothesis is reasonable. See *Johnson v. State*, 307 Ga. 44, 48 (2) (834 SE2d 83) (2019). Where the jury is authorized to find the evidence sufficient to exclude every reasonable hypothesis save

that of the accused's guilt, this Court "will not disturb that finding unless it is insupportable as a matter of law." Id.

The evidence was sufficient for the jury to have found that Thornton had a knife and that he used the knife to take Cooke's cell phone away from her before killing her, or that he took the phone right after killing her. Under either scenario, Thornton would be guilty of armed robbery. See *Johnson*, 307 Ga. at 49 (2) (b) (defendant would be guilty of armed robbery if he took victim's property after brandishing weapon); *Bates*, 293 Ga. at 857 (2) ("It is well-settled that a defendant commits a robbery if he kills the victim first and then takes the victim's property." (citation and punctuation omitted)). Thornton argues that the evidence did not exclude other reasonable theories that he did not commit armed robbery. But the jury was entitled to reject Thornton's hypotheses as unreasonable.

Thornton first argues that Cooke could have handed the assailant her phone voluntarily and that an altercation ensued after the assailant looked at her phone. But the evidence supports a finding that Thornton was carrying a knife at the time he

8

encountered Cooke outside her home. On the morning of Cooke's death, Daniel saw Thornton carrying something in his hands and walking in an agitated manner. When Daniel called Cooke to tell her about Thornton's presence, Cooke said she was in a rush to get to work. According to Cooke's aunt, Cooke had been refusing Thornton's calls and asked that he not call her anymore. This evidence shows that Cooke wanted nothing to do with Thornton, and that the jury was authorized to conclude that she would not have voluntarily handed her phone over to Thornton, as he suggests.

Thornton next argues that, even if Cooke did not hand over the phone voluntarily, the evidence could have supported a finding that he took the phone by force without displaying the knife. But Thornton was described as being in an agitated state while lurking outside of Cooke's house before she went outside. Because, as described above, the evidence showed that Thornton was carrying something during the time he was in an agitated state, the jury was entitled to find that Thornton was carrying a knife and that it was

very unlikely that he put the weapon away before encountering Cooke given his agitated state.

Thornton lastly argues that the State failed to prove that he intended to commit the armed robbery. The State could prove intent based on all of the circumstances connected to the offense, and it was the jury's responsibility to determine whether the State met its burden. See OCGA § 16-2-6 ("A person will not be presumed to act with criminal intention but the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted."); see also *Thomas v. State*, 320 Ga. App. 101, 104 (2) (739 SE2d 417) (2013) ("The presence or lack of criminal intent is for the jury to decide based on the facts and circumstances proven at trial."). The jury was authorized based on all of the evidence to conclude that Thornton had the intent to rob Cooke and find him guilty of armed robbery.

2. Thornton argues that the trial court erred by admitting into evidence a recording of Kimani's 911 call and testimony from a GBI

10

agent regarding bloodstain pattern analysis. We need not decide whether the trial court erred in admitting the evidence, because any such error was harmless.

Erroneous evidentiary rulings warrant reversal only if the error was harmful. See *Moore v. State*, 307 Ga. 290, 293 (2) (835 SE2d 610) (2019). For nonconstitutional rulings like those at issue here, the test for determining whether an error was harmless is whether it is highly probable that the error did not contribute to the verdict. See *Smith v. State*, 299 Ga. 424, 431-432 (2) (d) (788 SE2d 433) (2016). In conducting that analysis, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done. See id. at 432 (2) (d).

As to the 911 call, Thornton argues that the recording did not have any probative value because Kimani already testified about the substance of his 911 call and the recording was presented only to show Kimani's grief, which Thornton argues served only to inflame the jury's passions. But as Thornton concedes, the 911 call was largely cumulative of Kimani's testimony. And the evidence of

11

Thornton's guilt was very strong. Thornton was seen outside Cooke's residence on the morning of her death, and a bloody knife, a bloody hooded sweatshirt similar to the type he wore, and bloody gloves of the kind his employer furnished to its employees, all of which tested positive for the presence of Cooke's DNA, were found together with Cooke's cell phone in a trash bag outside Thornton's residence shortly after Cooke's murder. Given this strong evidence and the cumulative nature of the 911 call, which Thornton notes fails to show any of the circumstances of the killing, it is highly probable that the error did not contribute to the verdicts. See *Virger v. State*, 305 Ga. 281, 294 (7) (a) (824 SE2d 346) (2019) (the admission of other-acts evidence was harmless where it was cumulative of other evidence and the evidence of guilt was strong); see also *Anglin v. State*, 302 Ga. 333, 336 (2) (806 SE2d 573) (2017) (the erroneous admission of hearsay evidence is harmless where "substantial, cumulative, legally admissible evidence of the same fact is introduced").

As to the bloodstain pattern analysis evidence, the disputed testimony concerned a GBI agent's opinion as to how a certain bloodstain was formed. But this evidence had little, if any, prejudicial impact. There was no dispute that Cooke was stabbed numerous times, resulting in multiple bloodstains. The GBI agent's analysis of the bloodstain at issue did not provide any evidence of Thornton's guilt. Given that the complained-of evidence did not implicate Thornton, the jury was aware that Cooke's multiple stabbings would have caused several bloodstains, and the evidence of Thornton's guilt was strong, any error in admitting the GBI agent's testimony about the bloodstain pattern analysis was harmless. See *Robinson v. State*, 308 Ga. 543, 550 (2) (b) (i) (842 SE2d 54) (2020) (admission of video recording of arrest was harmless where the jury was aware that the defendant had been arrested and the evidence of guilt was strong).[2]

---

[2] Thornton makes no argument that all the evidentiary errors we assume today, though individually harmless, nevertheless harmed him when considered cumulatively, and no such cumulative prejudice is apparent to us on this record. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("[A]

3. Thornton argues that the trial court erred in denying his request for a continuance so he could access Cooke's Facebook account. Thornton has not shown that the trial court abused its discretion.

Prior to trial, the State obtained a data extraction of Cooke's cell phone and provided extracted information — text messages and call logs — to Thornton, but the defense complained at trial that the extraction did not produce information from applications like Facebook. After Cooke's cell phone was tendered into evidence at trial, defense counsel asked that the phone be connected to the internet so that he could access Cooke's Facebook application, based on Thornton's belief that the application contained evidence of abuse and threats from Cooke's ex-boyfriends. Defense counsel said he believed there was "potentially *Brady*[3] material" in Cooke's Facebook application because Thornton had seen Cooke's Facebook

---

defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").

[3] *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

content before, although counsel conceded that there might not be any exculpatory evidence. Defense counsel stated that he was unable to access that information through other means, because Thornton did not have access to Facebook while incarcerated, and counsel had not attempted to access Cooke's phone previously because the cell phone was damaged when police initially recovered it, and he was unaware that the State had since repaired it. The State argued that Thornton would have to follow a legal process to obtain permission to access information on Cooke's Facebook account, noting that the State would typically send Facebook a letter to preserve information and then seek a search warrant to get access to a user's account.

Based on the State's representations, and a review of federal statutes pertaining to accessing digitally-stored information, the trial court denied Thornton's request to use Cooke's cell phone to access the Facebook application, concluding that for *Brady* purposes, Thornton had knowledge of the information he was

15

seeking. Thornton then asked for a continuance to subpoena the Facebook records, which the court denied.

Thornton now argues on appeal that the trial court erred in denying his request for a continuance, stating that he should have been given an opportunity to collect more information through Facebook on "Trey," Cooke's ex-boyfriend who previously abused her, and present evidence that he could have used to cross-examine witnesses. He argues that the trial court's denial amounted to a *Brady* violation.

A trial court has broad discretion in granting or denying a motion for continuance. See OCGA § 17-8-22. A party making a request for a continuance must show due diligence. See OCGA § 17-8-20. We will not disturb a trial court's decision to deny a motion for continuance without a clear showing that the court abused its broad discretion. See *Phoenix v. State*, 304 Ga. 785, 788 (2) (822 SE2d 195) (2018). And for Thornton to show that he was entitled to a new trial based upon the trial court's denial of his motion for continuance, he must show that he was harmed by that denial. See id.

16

Thornton has not shown that the trial court abused its discretion or that he was harmed by the court's ruling. In arguing for access to Cooke's cell phone, Thornton stated that he had seen threatening messages from Cooke's ex-boyfriend Trey on Cooke's Facebook account. Although Thornton claimed that he (and defense counsel) attempted to access those records, he does not explain why the method he claimed he needed a continuance to pursue — subpoenaing the records — was unavailable to him prior to trial, precluding his ability to show that he was diligent in accessing information on Cooke's Facebook account.

Moreover, Thornton has not shown harm from the denial of the requested continuance. Thornton conceded several times that the purportedly threatening Facebook messages might not even be stored in Cooke's Facebook account. Thornton never provided any evidence to support his claim that Cooke's Facebook account contained *Brady* material. At the motion for new trial hearing, Thornton merely restated arguments from the trial but did not present any evidence or otherwise substantiate his claim that

17

Cooke's Facebook account actually contained relevant *Brady* material. The jury already heard that Trey had physically abused Cooke when they dated, so Thornton had available evidence with which to argue that someone else could have committed the crimes. Although he argues that accessing the Facebook information would have allowed him to cross-examine witnesses, he does not identify what witnesses he could have cross-examined more thoroughly or explain how the cross-examination he did conduct was inadequate.[4]

By failing to substantiate his claim that Cooke's Facebook account had *Brady* material and by failing to specify how that material would have mattered, Thornton's claim of harm is nothing but conjecture, and "mere speculation and conjecture that harm occurred is not enough to show harmful error." *Wainwright v. State*, 305 Ga. 63, 67-68 (2) (823 SE2d 749) (2019). Because Thornton only speculates that he was harmed, and there was strong evidence of

---

[4] To the extent he alludes to his cross-examination of Gail, who testified that Cooke confided in her that Trey had physically abused her, Gail testified that she did not recall whether Cooke told her that Thornton had been upset because Trey had physically threatened Cooke prior to her death.

18

Thornton's guilt, this claim of error fails. See id. (defendant failed to show harm from trial court's denial of a continuance to wait for lead counsel's arrival where defendant pointed to no error in co-counsel's performance during lead counsel's absence or deficiency in lead counsel's performance based on his absence); *Phoenix*, 304 Ga. at 788-789 (2) (defendant failed to show harm from denial of continuance to obtain expert to evaluate certain evidence when the evidence of guilt was overwhelming and there was no showing of how expert's testimony would have benefitted his defense).

*Judgment affirmed. All the Justices concur, except Colvin, J., not participating.*

Decided August 10, 2021.

Murder. Carroll Superior Court. Before Judge Hamrick.

*Randall P. Sharp*, for appellant.

*John H. Cranford, Jr., District Attorney, Christopher R. Keegan, Robert W. Mooradian, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.