317 Ga. 175
FINAL COPY

S23A0715. ANNUNZIATA v. THE STATE.

LaGrua, Justice.

Appellant Robert Annunziata was tried and convicted of malice murder and other crimes in connection with a shooting that took place outside of a nightclub that resulted in the death of John Price and injuries to Washington Young and Andrew Darling.[1] On appeal, Appellant contends that the trial court erred in refusing to instruct

---

[1] The crimes occurred on May 25, 2019. On November 19, 2019, a Fulton County grand jury indicted Appellant for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), three counts of aggravated assault with a deadly weapon (Counts 4, 5, and 6), possession of a firearm during the commission of a felony (Count 7), and possession of a firearm by a convicted felon (Count 8). Appellant was tried from September 28 to 30, 2021, and the jury found him guilty on all counts. Appellant was sentenced to serve life in prison without the possibility of parole plus 50 years. The felony murder counts were vacated by operation of law, and the aggravated assault count associated with Price merged into the malice murder count for sentencing purposes. Following his conviction, Appellant filed a motion for new trial on October 29, 2021, and amended his motion on February 28, 2022. A hearing was held on May 3, 2022. The trial court denied the motion for new trial, but vacated Count 8 after the State conceded that it failed to show evidence of a prior felony conviction. Appellant then filed a timely notice of appeal to this Court, and the case was initially docketed to this Court's August 2022 term but was remanded to the trial court to complete the record in February 2023. After the record was completed, this case was re-docketed to this Court's April 2023 term and submitted for a decision on the briefs.

the jury on voluntary manslaughter. We disagree and affirm.

The evidence presented at Appellant's trial showed that, in the early morning hours of May 25, 2019, Appellant arrived at a nightclub with two companions. They attempted to enter, but were not admitted, causing Appellant to become upset. Sloan Duckie, the event organizer, explained to Appellant that Appellant had paid for only one entry, and that he would have to pay two additional cover charges if he wanted his entire group to get into the nightclub. Appellant responded that he wanted a refund for the initial cover charge he had paid, so Duckie proceeded to process the refund through a mobile payment application. Appellant became upset because he wanted his refund immediately in cash, despite having paid the cover charge electronically. Duckie then explained that it would take a few days for the refund to go through, and he could not give Appellant cash because he had already initiated the electronic refund. Appellant became increasingly agitated.

Young and Price were working security at the nightclub that evening. Young was working just inside the front doors, and Price

was working outside in front of the nightclub. Young observed the interaction between Appellant and Duckie at the entrance to the nightclub. As the conversation intensified and "got loud[er]," Price approached Appellant and Duckie and told Appellant, "[I]t's time to go." After Appellant refused to comply with multiple requests to leave, Price picked up Appellant, carried him outside, and dropped him on the ground. Young testified that Appellant landed on his feet, but he "kind of fell backwards." Surveillance footage from the nightclub supported the witnesses' testimony at trial. Although there is no audio, Price and Appellant can be seen engaging in a heated exchange on the surveillance footage. Young testified that Price came outside and told Appellant: "[I]t's time to go. Just go home." Price then went inside the nightclub, and Young came outside and told Appellant to leave.

Appellant did not leave as instructed. After Price walked back into the nightclub, Appellant began "egging [Price] on" and attempted to reenter the nightclub, telling Price to "come outside." Surveillance footage from the nightclub's entrance showed

3

Appellant beckoning to someone inside the nightclub while standing outside the entrance; Price coming out of the nightclub and shoving Appellant; and Appellant falling into a sign outside the front of the entrance to the nightclub. The footage further showed that after Appellant regained his footing, he approached his friend and stood next to him while Price continued to appear agitated, motioning with his hands and speaking to Appellant and his friend. Young testified that he heard Appellant say repeatedly to his friend, "Give me the ting." Young testified that he understood "ting" to be West Indian slang for "firearm." Young heard Appellant's friend tell him, "Just wait, not now," and the two of them walked away from the nightclub around the corner of the building. Price re-entered the nightclub.

Young testified that he knew Appellant was "going to come back" because "he [was] upset," so Young took out his pistol and put it behind his back under his jacket.[2] Appellant then came running

---

[2] Young was licensed to carry a firearm and was routinely armed in his role as a security guard. At all times during the course of the evening, Price was unarmed.

back around the building with a gun in his hand. As Appellant started running up the stairs toward the entrance to the nightclub with a gun drawn, Young told him: "[T]here's no need for that[.] It's over. Everybody go home and have a good time. Tomorrow is another day." Appellant responded saying, "All right, it's cool . . . no problem," and initially started to walk away. Young testified that Appellant was "really upset," and while Appellant acted like he was leaving, he tried to push past Young and enter the nightclub with the gun. Young told everyone standing outside the nightclub to get inside, pulled his weapon, and held it behind his back while pushing Appellant away from the nightclub. Appellant reached around Young and began shooting toward Price and the front entrance of the nightclub. Young grabbed Appellant's gun-wielding arm, and Appellant stumbled down the stairs, shooting at Young. A bullet grazed the side of Young's right leg. Appellant and his friend ran, and Young chased them into the nightclub parking lot. Appellant shot at Young again, and Young returned fire. Appellant and his friend got into their vehicle and left the premises. Young heard

5

someone say that Price had been shot, so he returned to the nightclub to check on Price. Surveillance footage confirmed Young's testimony.

Around 2:00 a.m., Atlanta Police Department officers responded to a 911 call of "shots fired" at the nightclub. When they arrived, officers found a gunshot victim — later identified as Darling — next to the building and rendered aid to him. The officers also discovered a deceased victim — later identified as Price — lying on the patio outside the nightclub. Price had been shot in the left side of his face, and the medical examiner testified that, based on the bullet trajectory, his injuries were consistent with crouching on the ground when he was shot.

During their investigation, officers obtained a copy of the receipt for the refund processed to Appellant. Using the name on the receipt, officers were able to access Appellant's driver's license and photograph, and they used this photograph in lineups shown to multiple witnesses at the scene. Three witnesses, including Duckie and Young, identified Appellant as the shooter. After Appellant was

6

positively identified and officers reviewed the surveillance footage from the nightclub, an arrest warrant was issued for Appellant on May 26, 2019. Appellant was arrested by the Connecticut State Patrol on July 7, 2019, in Stonington, Connecticut, after being pulled over for speeding. Appellant was then extradited to Georgia.

In his sole enumeration of error, Appellant contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter.[3] At trial, Appellant submitted a written request to instruct the jury on voluntary manslaughter. Appellant did not testify at trial, and following the close of the evidence, the trial court informed the parties that it would not give a voluntary manslaughter instruction because the evidence did not support it. Appellant did not object after the jury was charged.

Because Appellant did not object to the trial court's refusal to instruct the jury on voluntary manslaughter, we review Appellant's

---

[3] A person commits voluntary manslaughter when he causes the death of another "under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" OCGA § 16-5-2 (a).

claim of instructional error for plain error and reverse only if (1) the instruction was erroneous, (2) the error was obvious, (3) the instruction likely affected the outcome of the proceedings, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. See *Davis v. State*, 312 Ga. 870, 874 (2) (866 SE2d 390) (2021). See also OCGA § 17-8-58 (b). And we need not analyze all of the elements of the plain-error test when, as in this case, Appellant has failed to establish one of them. See *Early v. State*, 313 Ga. 667, 672 (2) (b) (872 SE2d 705) (2022). Turning to our analysis of whether the trial court committed plain error in refusing to give the voluntary manslaughter charge, we conclude that there was no error, because, as discussed below, the evidence presented did not meet the threshold of "slight evidence" necessary to require a jury charge on voluntary manslaughter. See *Thompson v. State*, 312 Ga. 254, 257-258 (2) (862 SE2d 317) (2021).

Although a trial court is required to charge the jury on voluntary manslaughter if there is "any evidence, however slight" to support such a charge, *Thompson*, 312 Ga. at 257 (2) (citation and

8

punctuation omitted), it is still "a question of law for the courts to determine whether the defendant presented any evidence of sufficient provocation to excite the passions of a reasonable person." *Barton-Smith v. State*, 309 Ga. 799, 801 (2) (848 SE2d 384) (2020) (citation and punctuation omitted). "This is an objective standard, and we must evaluate the alleged provocation evidence with respect to its effect on a reasonable person, putting aside any peculiar response Appellant may have had." *Orr v. State*, 312 Ga. 317, 320-321 (2) (862 SE2d 513) (2021) (citation and punctuation omitted). Further, evidence of a "violent exchange" or the exchange of angry statements does not amount to the serious provocation within the meaning of OCGA § 16-5-2 (a). *Jones v. State*, 314 Ga. 466, 470 (2) (877 SE2d 568) (2022) (noting that despite a "violent exchange" between the appellant and victim and that the two "had some kind of words," the interaction did not qualify as serious provocation to warrant a voluntary manslaughter charge). Even a physical confrontation between two individuals does not necessarily provide the slight evidence necessary to require a voluntary manslaughter

charge. See *Johnson v. State*, 313 Ga. 698, 700 (873 SE2d 123) (2022) (voluntary manslaughter instruction was not warranted when the gunshot victim knocked on the front door of the defendant's mother's home, confronted the defendant for disrespecting his mother, and when defendant pulled a gun on the victim, the victim shoved the gun away, causing the defendant to fall, become upset, and then shoot the victim).

Appellant argues that there was evidence from which the jury could have concluded that the shooting was the result of a "sudden, violent, and irresistible passion resulting from serious provocation" because Price "physically picked [Appellant] up, took him outside, and dropped him, causing [Appellant] to fall backwards," and then, at another point, Price shoved Appellant. However, no evidence was presented to show that anything occurred on the night of the shootings that rose to the level of the serious provocation necessary to support a voluntary manslaughter instruction. Being tossed out of a nightclub after a disagreement about the cover charge would not provoke in a *reasonable* person a "sudden, violent, and irresistible

10

passion" to shoot and kill the security guard. OCGA § 16-5-2 (a). See *Mobley v. State*, 314 Ga. 38, 43 (875 SE2d 655) (2022) (holding that, because the defendant knew he was not permitted on the victim's premises and had ignored the victim's demand to leave, the victim's conduct in refusing to let the defendant into her home, arguing with the defendant, and shooting the defendant "would not be sufficient to excite [a sudden, violent, and irresistible] passion in a *reasonable person*" (emphasis in original)).

Appellant also argues that the "charge conference should not have focused on whether or not sufficient time had elapsed for the jury to find a 'cooling off' had occurred" because "[t]he security video showed that only 25 seconds elapsed between when [Appellant] . . . began to leave the [nightclub] entrance [ ] and when he returned with a gun," and the jury could have found that "25 seconds" was not a "sufficient interval after the provocation" for Appellant to cool off. However, the charge-conference transcript does not reflect that the trial court considered the interval between the provocation and the shooting in determining there was not slight evidence of serious

11

provocation. But, in its order denying the motion for new trial, the court clarified that there were two independent and alternative grounds for refusing to instruct the jury on voluntary manslaughter and that the interval factored into its reasoning as to only one of those grounds. Specifically, the court concluded that there was no evidence of serious provocation that would "excite [a] sudden, violent, and irresistible passion in a reasonable person," and the court separately concluded that "there was an interval sufficient for the voice of reason and humanity to be heard."  See *Henderson v. State*, 234 Ga. 827, 831 (2) (218 SE2d 612) (1975) (noting that, although the jury must determine whether there was an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, "it is a question of law for the courts to determine whether there [was] slight evidence that the defendant acted as the result of sudden, violent, and irresistible passion resulting from serious provocation"). The court did not consider the interval between the provocation and the shooting in determining that there was not even slight evidence of serious

12

provocation, and, as we concluded above, the court correctly declined to instruct the jury on voluntary manslaughter on that basis. Accordingly, we need not address the court's alternative ruling that the charge was unwarranted due to a cooling-off period.

*Judgment affirmed. All the Justices concur.*

Decided August 21, 2023.

Murder. Fulton Superior Court. Before Judge Ellerbe.

*Kevin A. Anderson*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Jayna Edwards, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.