NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0176
Christopher Dean Snow
v.
The State

On Appeal from the Superior Court of Chatham County
No. 2023CR650LHB

Decided: May 19, 2026

McMILLIAN, Justice.

Appellant Christopher Snow was convicted of malice murder for stabbing his wife Casey Allen to death.[1] On appeal, Snow argues that the trial court erred in admitting testimony under the residual hearsay exception; denying Snow's pretrial motion for a continuance; admitting a prior felony conviction into evidence un-

---

[1] Allen died on the night of April 14, 2023. On June 14, 2023, a Hall County grand jury indicted Snow for malice murder (Count 1), felony murder predicated on aggravated assault, family violence (Count 2), and aggravated assault, family violence (Count 3). At a trial held in May 2024, the jury found Snow guilty of all counts. The trial court sentenced Snow to serve life in prison without the possibility of parole for Count 1, merged Count 3 into Count 1, and purported to also merge Count 2 into Count 1, although Count 2 was actually vacated by operation of law. See *Washington v. State*, 313 Ga. 771, 772–73 (2022). Snow filed a timely motion for new trial, which was amended by new counsel. Following a hearing, the trial court denied Snow's motion for new trial, as amended, on June 30, 2025. Snow filed a timely notice of appeal on July 22, 2025, and the case was docketed to the term of this Court beginning in December 2025 and thereafter submitted for a decision on the briefs.

der OCGA § 24-6-609 ("Rule 609"); refusing to vacate Snow's conviction because the indictment failed to allege Allen's killing was unlawful; and overruling Snow's objection to a statement made during the prosecutor's closing argument. For the reasons that follow, we affirm.

1. The evidence presented at trial showed that Snow stabbed Allen to death in their apartment during the night of their first wedding anniversary. They began dating in 2021 and got married on April 14, 2022. About nine months later, Allen gave birth to the couple's son. On the night of their first wedding anniversary, Snow's aunt took care of their son at her home, so they could go out and celebrate their anniversary.

At approximately 7:30 a.m. the next morning, Snow called his father and told him, "Dad, I can't fix this. I really F'd up and did – you know, I'm really sorry. I'm really sorry …. We were there and she had a knife and I don't know if she meant to but she might have nicked me. I'm not sure. I lost it …. She's dead." Snow's father urged him to call the police, but instead, Snow went to his aunt's house to pick up his son. Snow told his aunt that he and Allen got in an argument the night before about her driving home after drinking and that she did not come home, even though Snow and Allen had plans to go with Snow's aunt to a family birthday party that day. Snow's aunt went to the party without them, where Snow's father told the aunt that Allen was dead. After Snow's aunt left the party, she found Snow back at her house when she arrived. Snow told his aunt, "I accidentally killed her." Snow said that after he and Allen had argued the night before, she got a knife, and he tried to take it away from her to prevent her from harming herself. But after Allen accidentally cut Snow on the arm, he "lost it" and killed her. Snow showed his aunt a cut on his arm, which she described as "not bad." She did not see

2

any other wounds on Snow. After Snow told her that he did not want to live and left, Snow's aunt called 911 to report the killing.

Police responded to Snow and Allen's apartment, where they found Allen's body under a pile of blankets with multiple stab wounds. A chair with their baby's pictures on it was facing her body. The medical examiner who performed Allen's autopsy testified that Allen was stabbed and slashed about the head, face, neck, chest, and arm 19 times, causing her death, the manner of which was homicide. A large laceration on Allen's left arm was consistent with a defensive wound.

Later the same day that police discovered Allen's body, they responded to a vehicular collision on Interstate 85. Snow had driven at a high rate of speed into an energy absorption device at an exit on the interstate. Snow was transported to the hospital, where he was treated for injuries, which included "a knife wound that was not crash related."

At trial, Allen's sister Tiffany Agee testified that she and Allen used to talk "very often," but "[i]t slowly started to decrease" after Allen started dating Snow, and Allen had told Agee, "I'm sorry. [Snow] doesn't like how much we talk." Agee also testified about a specific instance of domestic violence by Snow that Allen told Agee about before the couple was married. Allen told Agee that "Chris and I got into an argument in the kitchen and he had slammed my head into the cabinet and he choked me and said, 'I could kill you right now and no one would do anything or find out.'" Agee testified that Allen "told me that she had gone to the hospital to get stitches." Agee testified that Allen told her, "[p]lease do not hate him. He said he's sorry. I've forgiven him. Please don't hold any anger towards him …. He's said he's sorry and it will never happen again." On cross-examination, Snow

3

elicited testimony that if Allen had received stitches at an emergency room, Agee believed that Allen would have gone to the local hospital in Gainesville, and that Agee had never seen Snow "put his hands" on Allen. Later in the trial, Snow tendered the emergency room records for the hospital in Gainesville, which contained no record of Allen receiving stitches during the time period of her relationship with Snow, and also elicited the testimony of a friend of Snow and Allen, who said he never observed Allen with stitches.

Snow's defense at trial was that he committed voluntary manslaughter rather than murder. Snow testified that after he and Allen had been out for their anniversary, they got in an argument about her driving home drunk. He said that Allen got a knife from the kitchen, but he blocked her from going into the bathroom because she had cut herself in the past and he was concerned she would self-harm. He "tried real fast to grab [the knife]. And she realized [he] was going for it and kind of – she didn't mean to. She snatched it up and it caught me in the arm." Snow said that he was angry and said, "[n]ow that I have an injury, I can call the cops and get [our son] myself," and that when he turned to walk away, he felt a "like a pinch … In my shoulder, neck area," that felt like being stabbed. Snow testified that he "snap[ped] and los[t] it," "tackled" Allen, took the knife from her, and was on top of her in "not even a second." When asked by his trial counsel if he inflicted all of the wounds identified by the medical examiner, Snow responded, "I had to." Snow said he did not remember all of it, but thought he heard Allen say his name, realized what he had done and that she was dead, covered her body, put photos of their son in a chair beside her body, and got rid of the knife. Snow acknowledged that Allen "didn't deserve to die." He further testified that the next day he drove down Interstate 85 "looking for the perfect exit to end my life on …. At the same

4

time, I put a knife to my neck. And somehow I lived."

Snow also testified on direct examination about two prior convictions he has, from 2017 and 2022. Snow acknowledged that in 2017, he committed "[a]ggravated assault with a weapon, commission of a felony with a weapon, and attempted armed robbery," that the attempted armed robbery was a "horrible idea" and due to being "all doped out," and that no one was hurt in the process; he was released from prison in July 2021. As for the 2022 conviction, Snow testified that it was for an aggravated assault that involved an incident with Allen's ex-boyfriend, which included Snow stabbing himself and getting into a physical altercation with the ex-boyfriend.[2] At the start of cross-examination, the State tendered the certified copies of Snow's prior convictions, which were admitted. The State did not ask any further questions about them.

2. Snow contends that the trial court erred in admitting, under the residual hearsay exception, Agee's testimony that Allen told her Snow had physically assaulted Allen, causing her to get stitches. More specifically, Snow argues that the trial court erred because: (1) the statement did not have sufficient guarantees of trustworthiness; (2) the statement was not more probative on the point for which it was offered than other evidence the State could have located through reasonable efforts; and (3) the notice was not given sufficiently in advance of trial to provide Snow with a fair opportunity to prepare to meet it.

The record shows that on May 1, 2024, (the Wednesday before Snow's trial was set to begin on Monday, May 6) the State filed a notice of intent and motion to admit under the residual

---

[2] Before Snow testified, trial counsel questioned Snow's father about this incident, eliciting that Snow had stabbed himself.

hearsay exception, OCGA § 24-8-807 ("Rule 807"),[3] Agee's testimony about Allen's statements that Snow had previously assaulted her.  The trial court held a hearing that Friday, May 3, where the prosecutor made a proffer of Agee's residual hearsay testimony, and Snow's trial counsel presented some evidence attempting to undermine the Rule 807 evidence and requested a continuance, which was denied.  On the following Monday morning, counsel filed a written motion for a continuance, arguing that the State's notice was "late" and that "[w]ithout any evidence regarding the State's new discovery, going to trial at the present time would prejudice [Snow] and would cause defense counsel to try the case without competent investigation or preparation."  The trial court denied the motion and called the case for trial.

Trial counsel then requested a ruling on the Rule 807 evidence prior to jury selection, arguing that the residual hearsay

---

3 Rule 807 provides:
A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
(1) The statement is offered as evidence of a material fact;
(2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
(3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.
However, a statement may not be admitted under this Code section unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

6

notice "was given to us at 2:45 Friday," before the trial court corrected counsel that the notice had been given on Wednesday, and trial counsel conceded, "Well, Wednesday, and then I'm in another murder trial and I don't have any opportunity to investigate it until Friday." When questioned by the trial court, trial counsel acknowledged that he had made no attempt to contact Agee or to subpoena Allen's medical records from the local hospital until that Monday morning – conceding later that "maybe I should have done this Friday when directed by the Court" – and counsel asked the court to re-assess the issue when he received the records.

That afternoon, outside the presence of the jury, Agee testified that she and her sister Allen were "extremely close," talked regularly, and confided in each other, and Agee testified about the incident in question, when Allen once told her that Snow threatened and assaulted Allen, causing her to get stitches. On cross-examination, Agee testified that she had previously told someone on the prosecution team about the incident, prompting Snow's trial counsel to argue that the prosecutor had acted in bad faith in failing to give notice earlier of the intention to use the evidence, to which the prosecutor responded:

> I've been going through our notes. I understand that she said on the stand that she told us. I maintain that she did not. … And you'll just have to decide … is Ms. Agee mistaken that she told me about it or am I risking my entire career to lie about this one small piece of evidence in a murder case.

Snow's trial counsel also presented Allen's medical records from the emergency department of her local hospital, which contained no record of Allen receiving stitches during her relationship with Snow.

The trial court found that "after having the benefit of hearing [Agee] testify, the Court finds there is sufficient guarantees of trustworthiness," and further "that it is material and that there's no alternative way of getting this evidence presented to the jury. And so the Court would find that the residual hearsay could be admitted." The trial court further found that Agee "appeared to the Court as being uncertain in regards to who she has actually told …. So the Court is not going to find bad faith. The Court is not going to find that [the prosecutor] just stood up and lied to the Court."[4]

Rule 807's residual hearsay exception "applies when a hearsay statement is not 'covered' by other exceptions to the rule against hearsay but," as noted above, "has 'equivalent circumstantial guarantees of trustworthiness,' is 'offered as evidence of a material fact,' is 'more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts,' and its admission would best serve the 'general purposes of the rules of evidence and the interests of justice.'" *Williams v. State*, 322 Ga. 710, 712 (2025) (quoting Rule 807). And "[i]n determining whether to admit a statement under this provision, the trial court should consider the totality of the circumstances." *Williams*, 322 Ga. at 712 (citation and punctuation omitted). This Court reviews a trial court's Rule 807 admissibility ruling for an abuse of discretion, and we are "'particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction

---

4 Before that ruling, Snow's trial counsel had also asked for another continuance, this time to speak with a friend of Snow and Allen about Agee's allegations, but after ruling that Agee's testimony was admissible under Rule 807, the trial court also denied trial counsel's newest continuance request because counsel now had the medical records from Allen's local hospital and the friend's relationship to Snow and Allen was not new information.

that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.'" *Thompson v. State*, 302 Ga. 533, 544 (2017) (quoting *Rivers v. United States*, 777 F3d 1306, 1312 (11th Cir. 2015)).

The trial court did not abuse its discretion in admitting Agee's testimony recounting Allen's out-of-court statement about domestic violence under Rule 807's residual hearsay exception. Snow does not contest materiality, and the record supports the trial court's finding that the statement had sufficient guarantees of trustworthiness based on the evidence of the "extremely close" relationship between sisters Agee and Allen, as well as the trial court's own observations of Agee's demeanor while testifying in court. See *Williams*, 322 Ga. at 712 ("[W]e have repeatedly held that circumstances involving 'a victim's description of prior acts of domestic violence against her to her family and friends' carry 'an increased level of trustworthiness.'" (quoting *Merritt v. State*, 311 Ga. 875, 887 (2021)). See also *Ward v. State*, 313 Ga. 265, 271 (2022); *Rawls v. State*, 310 Ga. 209, 214–15 (2020); *Jacobs v. State*, 303 Ga. 245, 250 (2018).

Snow also argues that the trial court erred in not considering the lack of any other evidence corroborating the statement – pointing to the medical records, which lacked any indication that Allen ever got stitches around the relevant time – but the record actually indicates the opposite. The trial court stated on the record that it found sufficient guarantees of trustworthiness "even considering [the defense's] evidence." Moreover, we are aware of no rule in this context, and Snow has pointed to none, requiring a trial court to make specific findings on this or any other factor in considering and ruling on whether to admit residual hearsay under Rule 807. See *Smith v. State*, 311 Ga. 288, 291 (2021) ("Appellant cites no authority for the proposition that a trial court

9

must explicitly determine on the record that each requirement of OCGA § 24-8-807 has been met before admitting hearsay under the residual exception."). See also *Clark v. State*, 315 Ga. 423, 439–40 (2023) (noting, in context of reviewing trial court's ruling admitting defendant's custodial statement, "we generally do not require trial courts to make specific, on-the-record findings about each aspect of the totality of the circumstances they evaluate or to make explicit factual findings or credibility determinations on the record") (citation and punctuation omitted); *Holmes v. State*, 311 Ga. 698, 706 (2021) ("Trial judges [ ] are presumed to know the law and apply it in making their decisions, absent some indication in the record suggesting otherwise.") (citation and punctuation omitted).

The trial court also acted well within its discretion in concluding that the statement was more probative on the point for which it was offered than any other evidence reasonably procurable by the State, because a victim's own statement describing the defendant's prior violence toward her is generally more probative than other evidence about the same subject in light of the often-secretive nature of domestic violence. See *Williams*, 322 Ga. at 713–14; *Shellman v. State*, 318 Ga. 71, 78 (2024). Snow speculates that the State could have reasonably procured and utilized Allen's medical records instead as evidence of the domestic violence incident. But the only medical records that were presented contained no evidence of the incident – a point Snow relies on in also arguing that the trial court should not have admitted the Rule 807 evidence for lack of corroboration. Moreover, as argued by the State, even assuming such records existed, it is highly doubtful they would include the type of details about the domestic violence incident that Allen's statement included, such that they would not be more probative on that point than the Rule 807 evidence. See *Shellman*, 320 Ga. at 867 (holding that "it was within

10

the trial court's discretion to conclude that the victim's own contemporaneous account was more probative than" other evidence couched "in general terms" (cleaned up)).

Finally, Snow asserts that the State's notice that it was relying on residual hearsay evidence was untimely. Although we acknowledge that five-days' notice is limited, Rule 807 does not specify a deadline for providing notice of such evidence, instead requiring that "the proponent makes [it] known to the adverse party, sufficiently in advance of the trial … to provide the adverse party with a fair opportunity to prepare to meet it." In five-days' time, Snow's counsel had both the opportunity to speak with Agee and to subpoena Allen's medical records, which he was able to use both in voir diring Agee and as trial evidence to impeach her testimony. Cf. *Thompson*, 302 Ga. at 545 (noting that under Eleventh Circuit precedent, even "failure to provide pretrial notice of Rule 807 evidence is not fatal if the defendant is not harmed by the lack of notice and had a fair opportunity to address the statements" (citing *United States v. Parker*, 749 F2d 628, 633 (11th Cir. 1984)). See also *State v. Hamilton*, 308 Ga. 116, 125 (2020) ("Georgia's Rule 807 is based on the Federal Rules of Evidence (in this case Federal Rule 807), so when construing our Rule 807, we look to decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit.") (citation and punctuation omitted). And the trial court specifically found that the prosecutor was credible and not lying about only first learning the information the week before trial. Under the circumstances, the trial court did not abuse its discretion in admitting the evidence under the residual hearsay exception.

3.     Snow further contends that the trial court abused its discretion in denying his motions for a continuance to investigate

11

more fully the allegations from the residual hearsay notice. Specifically, Snow argues that the State's Rule 807 notice, filed five days before trial, did not allow him sufficient time to obtain medical records from other area hospitals or urgent care centers to show that Allen did not receive any stitches around the relevant time.

The trial court did not abuse its discretion in denying Snow's continuance requests. "All applications for continuances are addressed to the sound legal discretion of the court and, if not expressly provided for, shall be granted or refused as the ends of justice may require," OCGA § 17-8-22, and "we will not disturb such a ruling without a clear showing that the court abused its discretion." *Kimbro v. State*, 317 Ga. 442, 447 (2023). See also *Thornton v. State*, 312 Ga. 224, 231 (2021) ("We will not disturb a trial court's decision to deny a motion for continuance without a clear showing that the court abused its broad discretion."). Further, "the party making an application for a continuance must show that he has used due diligence." OCGA § 17-8-20. Here, where trial counsel admitted that he was less than diligent in investigating the State's Rule 807 notice, but still had the opportunity to interview Agee prior to trial and was still able to investigate and procure evidence to counter the Rule 807 evidence, we do not see an abuse of discretion in the trial court's denial of Snow's continuance requests. See, e.g., *Kimbro*, 317 Ga. at 446–48 (holding trial court did not abuse its discretion by denying defendant's motion for continuance on the ground that the State filed additional discovery and an updated witness list 10 days before trial where defendant was provided opportunity to review that discovery and interview those witnesses prior to presentation of the evidence at trial); *Thornton*, 312 Ga. at 231 (holding trial court did not abuse its discretion by denying defendant's motion for continuance where defendant failed to show he diligently

12

investigated and subpoenaed relevant evidence).

4.     Snow next contends that the trial court abused its discretion in admitting his 2017 conviction for impeachment purposes under Rule 609,[5] and, in the alternative, admitting the underlying details alleged in its indictment, including that the conviction involved knife violence.

Prior to trial, the State filed a motion to admit evidence of Snow's 2017 attempted armed robbery and aggravated assault with a knife conviction and a 2022 aggravated assault conviction as impeachment evidence pursuant to Rule 609 in the event Snow elected to testify. At the outset of trial, when Snow's trial counsel announced that Snow would testify and requested a ruling on the State's motion, the trial court granted the motion, reasoning that because Snow's defense theory would be that he was guilty merely of voluntary manslaughter, his "credibility is absolutely central to the outcome of the case," and the prior convictions were admissible under Rule 609's balancing test. The trial court stated that it would give a limiting instruction as to the Rule 609 evidence, which it did. On appeal, Snow only challenges the admission of the 2017 conviction.

"A trial court's decision under Rule 609 is reviewed for an abuse of discretion." *Patterson v. State*, 314 Ga. 167, 178 (2022). Pretermitting whether the trial court abused its discretion in admitting the 2017 indictment and conviction under Rule 609, we conclude that any error was harmless under the circumstances. "The test for determining nonconstitutional harmless error is

---

5 Rule 609(a)(1) provides in relevant part: "For the purpose of attacking character for truthfulness of a witness … evidence that an accused has been convicted of [a felony] crime shall be admitted if the court determines that the probative value of admitting the evidence outweighs its prejudicial effect to the accused."

13

whether it is highly probable that the error did not contribute to the verdict." Id. at 179 (cleaned up). The State bears the burden of making that showing, and we conduct our review by "weigh[ing] the evidence as we would expect reasonable jurors to have done." *Wilson v. State*, 322 Ga. 76, 92 (2025). "In the context of Rule 609, error is harmless if the witness'[s] credibility was sufficiently impeached by other evidence, or if the State's case was strong enough to support the conviction even apart from the" error. *Patterson*, 314 Ga. at 179.

Here, the evidence supporting the State's malice murder case against Snow was strong apart from the 2017 conviction, and there was weak, almost non-existent evidence of sufficient provocation to support voluntary manslaughter, which was Snow's primary defense at trial. OCGA § 16-5-2(a) provides:

> A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

The jury heard evidence which included Snow's own admission on the stand to killing Allen, including his testimony that he was angry after she accidentally nicked him with a knife during their argument and then "had to" to stab her 19 times in response

14

to feeling another "pinch" around his shoulder or neck as he turned to walk away. But conduct that causes fear for one's safety and fighting in response do not constitute the type of serious provocation that supports a voluntary manslaughter charge. See *Jivens v. State*, 317 Ga. 859, 862 (2023) ("[F]ear for one's safety, nor fighting are the types of provocation that demand a voluntary manslaughter charge."); *Annunziata v. State*, 317 Ga. 175, 179 (2023) ("Even a physical confrontation between two individuals does not necessarily provide the slight evidence necessary to require a voluntary manslaughter charge."). The jury also heard testimony of Allen's statement that Snow had previously assaulted and threatened that he could kill her and no one would find out or do anything about it. This was overwhelming evidence, apart from the 2017 conviction, from which a reasonable jury could readily find Snow guilty of malice murder and reject his theory of voluntary manslaughter. See *McGuire v. State*, 307 Ga. 500, 503–04 (2019) (holding there was strong evidence of guilt from which the jury could find defendant guilty of malice murder and reject his theory of voluntary manslaughter, which was based on his argument that he wrestled the gun away from victim and shot her in a rage after she first shot at him during a heated argument about drinking); *Mathis v. State*, 279 Ga. 100, 101 (2005) (holding there was strong evidence of guilt from which the jury could find defendant guilty of malice murder and reject his argument that he was guilty merely of voluntary manslaughter based on his claim that he shot his wife after she reached for his gun during a heated argument).

Moreover, Snow's 2022 conviction, which he does not challenge on appeal, also involved a knife, and the State did not question him about the facts and underlying circumstances of either conviction. Instead, Snow chose to elicit details about the 2022 conviction through Snow and his father, including that Snow

15

stabbed himself during that incident. Because the prejudicial effect from the scant evidence about the 2017 conviction was marginal as compared to the overwhelming evidence of Snow's guilt and was largely cumulative of the evidence of the 2022 conviction, the State has met its burden of showing that the admission of the 2017 conviction did not likely affect the verdict. See, e.g., *Jones v. State*, 305 Ga. 653, 656–57 (2019) (concluding that any error in admitting defendant's prior conviction or in the elicitation of testimony that the conviction rendered his firearm possession illegal was harmless because it was highly probable the outcome of the trial would have been no different had that evidence not been introduced given the other strong evidence of guilt); *Martin v. State*, 306 Ga. 538, 541–42 (2019) (concluding that any error in admitting defendant's prior indictment and conviction for theft by receiving a firearm, which defendant argued made it appear he was prone to carry firearms, was harmless given the other substantial evidence of guilt).

5.      Snow also argues on appeal that the trial court erred in refusing to vacate Snow's conviction because the indictment failed to allege Allen's killing was unlawful, a required element of the charge.[6] But because Snow never filed any demurrer or motion in arrest of judgment and only first raised this issue in his

---

6 In full, Count 1 of the indictment alleged that the grand jury:
In the name and on behalf of the citizens of the State of Georgia, charge and accuse CHRISTOPHER DEAN SNOW with the offense of MALICE MURDER, for that the said accused in the County of Hall and the State of Georgia, between the 14th day of April, 2023, and the 15th day of April 2023, the exact date of the offense being unknown to the Grand Jury, did with malice aforethought cause the death of Casey Allen, a human being, by stabbing her, in violation of OCGA 16-5-1(a), contrary to the laws of said State, the good order, peace and dignity thereof.

16

motion for new trial, this dubious challenge of the indictment was not preserved for appeal. See *Taylor v. State*, 303 Ga. 583, 587 (2018) ("To raise a defective indictment claim on appeal, a defendant must first raise the issue by general or special demurrer or by a timely motion in arrest of judgment after conviction.").

6. In his final enumeration of error, Snow argues that the trial court erred in overruling Snow's objection to the prosecutor's statement during closing argument that "finding him guilty of voluntary manslaughter would essentially say Casey Allen was asking for it." Snow argues that this was a misstatement of the law warranting reversal of his convictions.

Pretermitting whether the prosecutor's statement fell within the wide latitude afforded prosecutor's during their closing arguments, see *Kimbro*, 317 Ga. at 452, any error in overruling Snow's objection to it was harmless. See *Allen v. State*, 317 Ga. 1, 8 (2023) ("A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict.") (citation and punctuation omitted). The trial court instructed the jury that the closing remarks of the attorneys were not evidence and properly instructed the jury on the law of voluntary manslaughter. And the evidence of Snow's guilt was overwhelming in comparison to the weak, almost non-existent evidence that sufficient provocation existed for Snow to stab Allen 19 times, as would be required for a voluntary manslaughter conviction. Under the circumstances of this case, it is highly probable that any error in overruling Snow's objection to the prosecutor's statement did not contribute to the verdict. See, e.g., *Taylor*, 303 Ga. at 587 (holding that it was highly probable that trial court's overruling of defendant's objection to prosecutor's allegedly improper comments during closing argument did not contribute to verdict "[c]onsidering the overwhelming evidence of [defendant's]

17

guilt, in addition to the trial court's jury instruction").[7] Therefore, this claim fails.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

---

[7] Snow does not argue that the errors we have assumed for purposes of analysis and determined individually to be harmless – admitting the 2017 conviction and allowing the prosecutor's statement in closing – cumulatively resulted in prejudice mandating a new trial, and in light of the other evidence in the case, and from our review of the record, we discern no cumulative prejudice warranting reversal. See Guyton v. State, 321 Ga. 57, 64 n.7 (2025); see also State v. Lane, 308 Ga. 10, 18 (2020) ("[A] defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").