NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 30, 2024

S24A0399. PLATT v. THE STATE.

PETERSON, Presiding Justice.

Rodrigues Platt[1] appeals his convictions related to the shooting death of David Jones, Jr.[2] On appeal, Platt argues that the trial

---

[1] Platt's first name is spelled "Rodriguez" in some court filings and in his brief, but most of the court filings below use "Rodrigues."

[2] The crimes occurred on June 16, 2009. In February 2010, a Liberty County grand jury indicted Platt, Jedediah Duncan, and Steven Bond for malice murder, felony murder predicated on aggravated assault, aggravated assault, armed robbery, burglary, and possession of a firearm during the commission of a crime. The court severed the co-defendants' trials, and the record does not show the status of those cases. A jury found Platt guilty on all counts at an August 2011 trial, and the trial court sentenced him to life in prison for malice murder, two concurrent twenty-year terms for armed robbery and burglary, and a consecutive five-year term for the firearms offense. The other counts were merged or vacated by operation of law. Platt filed a motion for new trial in August 2011 and amended it in 2019. The trial court denied the motion in September 2023. Platt timely filed a notice of appeal, and the case was docketed to this Court's term beginning in December 2023 and submitted for a decision on the briefs.

The record does not reveal why it took well over a decade to resolve Platt's motion for new trial. Platt asserts no claim about the post-conviction delay, but we nevertheless remind trial courts and attorneys of their duty diligently and efficiently to resolve pending motions for new trial.

court should have granted a mistrial due to the State's failure to disclose the inconclusive test results of a hair sample from a critical witness against him who was also a possible suspect in the timely manner required by OCGA § 17-6-4 and *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10LE2d 215) (1963). He also argues that the court should have granted a mistrial based on the State's belated disclosure that Platt's initial custodial interview had been recorded despite previously representing otherwise. Platt also argues that the trial court should have taken some curative action when the prosecutor improperly identified him for testifying witnesses, and that the cumulative prejudice of these errors warrants a new trial. We conclude that Platt has failed to establish that a mistrial was necessary to preserve his right to a fair trial, that any curative action was necessary based on the prosecutor's identification of him, or that any errors cumulatively prejudiced him. Therefore, we affirm.

The evidence at trial showed the following. Jones lived in the Tapco Mobile Home Park in Liberty County. He sold drugs and kept

2

his money in a small, black travel safe. On June 16, 2009, Jones was shot multiple times in his mobile home, leading to his death. Jarius Wilson lived in a mobile home close to the victim's and heard a noise on the day of the shooting that sounded like firecrackers. After he heard the sound, Wilson looked out his window and saw "some guys" wearing masks running from the victim's home and toward a "grayish-greenish" SUV.

Monique Hendry, Platt's sister, testified that on the day of Jones's death, Platt, Steven Bond, and Jedediah Duncan were at Hendry's mother's house. Bond and Duncan were wearing camouflage, had gas masks, and were playing with a black gun. The three men left in a "goldish" SUV driven by Duncan.

Miriam Brown testified that on the day of the shooting, Duncan picked her up and drove her to Hinesville, driving a tan or gold SUV. Bond was also in the vehicle, and the two men were wearing army fatigues, jeans, and black shirts. On the drive to Hinesville, Bond and Duncan showed her a gas mask and a bulletproof vest, and Duncan passed a black gun to Bond. Duncan and Bond dropped off

Brown. When they picked her up later that day, she heard one of them say, "I can't believe it," that they had killed someone, and that they had shot "him" three times because "he had seen his face." Duncan and Bond said that they had gone to the victim's house to "kick in the door" and that they took a safe that was full of "eight balls," which Brown said meant crack cocaine.

Bruce Coleman testified that he was at Tapco on the morning of the shooting and went to the store with Duncan and Bond in Duncan's gold SUV. Before dropping Coleman off at the Pineland Apartment complex where Coleman's girlfriend lived, Duncan and Bond talked about "a lick," which Coleman described as a robbery, and Coleman declined their invitation to join them. Later that day, Coleman saw Duncan drop off Platt and Bond at Pineland. Bond said they had robbed and shot someone, possibly killing the victim. Coleman did not believe Bond, so he went to ask Platt, who had walked away. Platt said that "they" probably had killed "him" and showed Coleman a gun that Platt said was used during the robbery.

Steve Plair, Bond's older brother who also lived at Tapco at the

4

time of the shooting, said that on the morning of the shooting, Duncan and Bond were outside the mobile home discussing robbing someone. Plair said that Platt, Bond, and Duncan were at his mobile home later that night, and Platt had a revolver. Plair testified that the three men left, and 35 to 45 minutes later, Plair heard gunshots. Plair saw Platt a few days later, and Platt admitted to shooting someone called "Little Dave." Platt said that when he was in the victim's mobile home, Platt's face covering slipped, so he guessed the victim saw him. Platt said he shot the victim three times, while Duncan retrieved the safe. Plair admitted that on the night of the shooting, he hid from police but later turned himself in. Plair was arrested because someone identified him as being involved in the shooting, but he denied being involved and said he knew nothing. Plair later told police about Platt's statements, admitting that he did so only after being charged with murder in this case — charges that were ultimately dismissed.

During the investigation, Duncan led police to a field where they found, among other things, a stocking cap that had hairs inside,

a camouflage shirt and pants, a gas mask, and a safe that had "3A2" written on it. The same inscription — "3A2" — was also written on a key found in the victim's pocket. Police also found one 9mm shell casing at the bottom of the steps to the victim's mobile home and another in Duncan's vehicle, and a firearms expert testified that they were fired from the same weapon.

Platt was interviewed by police on two different days. During the second interview, which was recorded and played for the jury at trial, Platt admitted participating in the armed robbery and that Jones was shot during the crime. He denied shooting Jones. Platt, Duncan, and Bond were charged with several crimes, and following a jury trial, Platt was convicted of malice murder, armed robbery, burglary, and possession of a firearm during the commission of a crime.

1.    Platt argues that the trial court should have granted a mistrial based on the State's untimely disclosure that it had compared the hairs found in the recovered stocking cap against Plair's hair and found the results inconclusive. We disagree.

6

Platt filed a pretrial discovery motion, requesting, among other things, the results of all scientific tests and all *Brady* material. Two weeks before trial, defense counsel met with the prosecutor, the lead investigator Detective Snider, and other police officers, to review every exhibit the State intended to introduce at trial. The State did not at that time disclose to Platt that it had tested Plair's hair with inconclusive results.

During opening statements, Platt's counsel told the jury that, although the State had compared the hair recovered from the stocking cap to the defendants in the case and did not find a match, the State never compared those hairs to hair samples from Plair. In fact, that was not true: unbeknownst to trial counsel, the State had made that comparison, although the results were inconclusive. After opening statements and during a recess, the State disclosed to Platt for the first time that it had tested Plair's hair with inconclusive results. Platt moved for a mistrial and called Detective Snider in support of that motion. Detective Snider testified that a few weeks before trial, he talked to the GBI agent who conducted the test on

7

Plair's hair, and was told that the initial comparison was "tentatively" inconclusive, the agent would prepare a final report after peer review, and the agent would submit samples for DNA testing, which Detective Snider understood to mean that the agent had only looked at the hair samples under a microscope. Detective Snider confirmed that, although testing results for Platt and other defendants were provided to Platt as part of discovery, no information about the testing of Plair's hair was provided. Detective Snider said he had not talked to the GBI agent since being informed of the inconclusive results.

The court denied the mistrial motion, concluding that the results did not "help or hurt either side." The court allowed Platt's counsel to reopen opening statements. Counsel told the jury that he made a misstatement about Plair's hair never having been tested and this was caused by the State's failure to disclose this information. Counsel insisted that the State was "hiding evidence," that he had been subjected to "trial by ambush," that he had been unable to prepare the defense adequately or conduct independent

8

testing of the hair given the last-minute disclosure, and that this was "all the reasonable doubt" the jury needed.

On appeal, Platt argues that the untimely disclosure impaired his defense and that a mistrial was therefore warranted. A trial court is vested with broad discretion as to whether to grant a mistrial, and a court's decision not to grant one will not be disturbed on appeal unless there is a showing that a mistrial was essential to preserve a party's right to a fair trial. See *Jordan v. State*, 305 Ga. 12, 15 (2) (823 SE2d 336) (2019); *Ragan v. State*, 299 Ga. 828, 833-834 (3) (792 SE2d 342) (2016).

Platt argues primarily that a mistrial was necessary to remedy the State's violation of *Brady*. Under *Brady*,

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. This includes the suppression of impeachment evidence that may be used to challenge the credibility of a witness.

*Hood v. State*, 311 Ga. 855, 863 (1) (860 SE2d 432) (2021) (citations and punctuation omitted); see also *Chavez v. State*, 307 Ga. 804, 813

9

(3) (837 SE2d 766) (2020) (to be entitled to a new trial, a defendant must show that the evidence is "material to his guilt or punishment" (citation and punctuation omitted)). Evidence is "material" in this context when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A 'reasonable probability' of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." *Chavez*, 307 Ga. at 813 (3) (citations and punctuation omitted). "In the case of an untimely disclosure, a defendant must show that an earlier disclosure would have benefited the defense and that the delayed disclosure deprived him of a fair trial." *Anglin v. State*, 312 Ga. 503, 510 (2) (b) (863 SE2d 148) (2021) (citation and punctuation omitted). Platt has failed to make this showing.

Platt first argues that the untimely disclosure affected his opening statement, and that the entire defense, as reflected by the opening statement, became "unsupported" by the late disclosure. Although the untimely disclosure undermined his statement about

a lack of testing, Platt was able to argue to the jury that the State was "hiding evidence," creating doubt as to the thoroughness of the State's investigation.

Platt also argues that the untimely disclosure hampered his defense, but he does not show how he would have altered his defense if given the information sooner. Platt claims that he could have procured independent DNA testing of the hair had he been made aware of the inconclusive results sooner, and that he could have used this information to impeach Plair and establish his motive for saying that Platt confessed to him that Platt shot Jones. Platt's arguments are meritless. Platt knew about the hair recovered from the stocking cap. Although he thought the hair had not been compared to Plair's hair, as reflected by his initial opening statement, there is no evidence in the record that he ever sought to secure independent DNA testing of the recovered hair prior to trial. And Platt's claim about what the DNA testing would reveal is purely speculative, as there is no evidence of such testing. Platt argues in his appellate brief that "[i]t could have been [Plair's] hair in the stocking cap[,]"

but further testing could have alternatively revealed that the hair belonged to Platt. In any case, whatever the results of DNA testing would have revealed, Platt has not shown that any further impeachment of Plair would have made a meaningful difference. Moreover, Platt was able to impeach Plair about his motive for saying that Platt confessed to the crime, suggesting that Plair named Platt only after Plair himself was charged in the case. See *Hood v. State*, 311 Ga. 855, 864-865 (1) (860 SE2d 432) (2021) (although full scope of witness's "possible incentives to cooperate with the State was not made known to the jury, the jury was nonetheless aware there was reason to regard his testimony with skepticism[,]" and witness's testimony was largely cumulative of other evidence, so defendant was unable to establish materiality). Because Platt has shown only a mere possibility that additional testing would have been favorable to his defense, he has failed to show a *Brady* violation. See *Mitchell v. State*, 307 Ga. 855, 862 (2) (b) (838 SE2d 847) (2020) (rejecting *Brady* claim as not establishing materiality because defendant offered no evidence in support of his

speculation that had he been provided with information about fingerprints lifted from a taxi where the victim was found dead, he could have procured independent testing that would have helped his defense).

Platt also argues that the State's failure to disclose the inconclusive results violated statutory disclosure rules. Specifically, Platt argues that the State violated OCGA § 17-16-4 (a) (4) by failing to reduce to writing the GBI agent's oral report and failing to provide him with a copy of the same. By its terms, however, the statute imposes a duty on the State to provide the results of scientific testing, including if a report is "oral or partially oral," only "if the state intends to introduce [the results of the testing] in evidence in its case-in-chief or in rebuttal[.]" See OCGA § 17-16-4 (a) (4).[3] There

---

[3] The subparagraph provides:

The prosecuting attorney shall, no later than ten days prior to trial, or as otherwise ordered by the court, permit the defendant at a time agreed to by the parties or ordered by the court to inspect and copy or photograph a report of any physical or mental examinations and of scientific tests or experiments, including a summary of the basis for the expert opinion rendered in the report, or copies thereof, *if the state intends to introduce in evidence in its*

13

was no indication that the State intended to introduce into evidence the "inconclusive results" of the testing of Plair's hair, so Platt has failed to demonstrate a violation of OCGA § 17-16-4 (a) (4). Because the untimely disclosure did not violate *Brady* or OCGA § 17-16-4 (a) (4), Platt's claim that the trial court erred in failing to remedy such violations necessarily fails.

2. Platt argues that the trial court should have also granted a mistrial, or at least a continuance, due to the State's untimely disclosure that Platt's first custodial interview had been recorded when it had previously represented otherwise. We disagree.

At a *Jackson-Denno*[4] hearing before trial, the investigator who had interviewed Platt, Detective Howard, testified that he

---

*case-in-chief or in rebuttal the results of the physical or mental examination or scientific test or experiment.* If the report is oral or partially oral, the prosecuting attorney shall reduce all relevant and material oral portions of such report to writing and shall serve opposing counsel with such portions no later than ten days prior to trial. Nothing in this Code section shall require the disclosure of any other material, note, or memorandum relating to the psychiatric or psychological treatment or therapy of any victim or witness.

OCGA § 17-16-4 (a) (4) (emphasis added).

[4] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

14

interviewed Platt on two different days, the second interview a full day after the first. Detective Howard testified that although he proposed recording the first interview, he did not actually do so. He testified that the second interview was recorded and that Platt's statements during the first interview were consistent with those given at the second interview.

Apparently based on this testimony, Platt argued during opening statements that the jury was not going to hear what happened during the first interview because it was not recorded; the jury would hear only what a police officer says happened; and the jury would hear only Platt's statements that were recorded after he had spent a night in a jail where the victim's father worked, which would have instilled fear into Platt.

During the lunch break on the second day of the trial, the State informed defense counsel that Platt's first interview had, in fact, been recorded. Defense counsel listened to the recording once over the lunch break and asked for a mistrial because the "new evidence . . . contradicts a good bit of what I've been saying and the way I've

tailored the defense in this — you know, during this trial for the past day and a half." Defense counsel alternatively asked for a continuance "at least for the rest of the day" to allow counsel to review the recording more thoroughly and incorporate the evidence into Platt's defense.

The prosecutor stated that she did not know about the recording until the second day of trial when Detective Howard mentioned it during a conversation; the prosecutor said she immediately let defense counsel know and suggested as a remedy that the recording not be played. Defense counsel noted in response that Platt's statements were not the same during the two interviews, as he did not inculpate himself in the first interview. Defense counsel later observed that this was the second piece of evidence that was not timely disclosed. In response, the prosecutor said she did not want to "start all over again. But if the Court feels that's the thing to do out of fairness, the State's really not . . . ." The trial court denied the motion before the prosecutor finished her statement.

Responding to the continuance request, the prosecutor did not

object to giving defense counsel the rest of the day to review the recording, but preferred to break for just three hours because the prosecutor had planned to call a witness who was travelling that day and wanted to get her "in and out." The court asked if the jury should hear "the truth about all this," and defense counsel said, "we have to . . . I don't see how we can't tell them, you know, that there's two pieces of evidence." After confirming that counsel had listened to the recording, the trial court denied a continuance.

The recordings of both interviews were ultimately played for the jury during Detective Howard's testimony. As captured in the recording of the first interview, Platt admitted to being in Tapco during the robbery and seeing parts of it from a nearby mobile home, but he denied being involved or knowing who shot Jones. During cross-examination, Platt elicited testimony that Detective Howard had previously testified at the *Jackson-Denno* hearing that Platt never denied being involved in the robbery.

Platt argues on appeal that the State's failure to advise him that his first interview was recorded and provide him a copy of that

17

recording violated OCGA § 17-16-4 (a) (1), and that a mistrial was warranted under the remedies available under OCGA § 17-16-6 because he showed that the State acted in bad faith and he was prejudiced as a result. For its part, the State does not dispute that it violated OCGA § 17-16-4 (a) (1) by failing to advise Platt that the first interview was recorded and allow him to inspect or copy it in advance of trial. Instead, the State argues that the trial court's remedial actions were adequate under OCGA § 17-16-6.

As stated above, a trial court has broad discretion to grant or deny a mistrial. This discretion also applies to whether to grant a mistrial as a remedy under OCGA § 17-16-6. See *Tubbs v. State*, 276 Ga. 751, 753-754 (3) (583 SE2d 853) (2003). A court also has the discretion to grant a continuance as a remedy for a violation of OCGA § 17-16-6. Id. at 753-753 (2), (3). As explained above, we will not overturn a trial court's decision to deny a mistrial unless a mistrial was essential to preserve the right to a fair trial. And to obtain a new trial from the improper denial of a continuance request, a defendant must show harm. See *Harris v. State*, 309 Ga. 599, 609

18

(3) (847 SE2d 563) (2020). Platt has failed to make these showings.

(i) *A mistrial was not essential to preserve Platt's right to a fair trial.*

Platt argues that he was prejudiced by the late disclosure because he had referenced the fact that the first interview was not recorded in his opening statement. But Platt does not show how the late disclosure harmed him.

He first argues that he was prejudiced because he referred to the first interview in his opening statement and it formed the basis of his defense. But he referred to that interview to suggest that he did not initially admit participating in the crime and made his admission during the second interview only as a result of fear after spending a night in jail. The recording of that first interview only bolstered this argument. In that recording, Platt admits to being in Tapco during the robbery and knowing about it, but he denied being involved or knowing who shot Jones. The recording thus supported, rather than undermined, Platt's opening statement where he suggested that his confession in the second interview was not

19

truthful.

Platt next argues that he was prejudiced because Detective Howard testified at the motions hearing that Platt's statements in the two interviews were consistent. But Platt was able to use the recording to impeach Detective Howard's credibility by showing that Detective Howard's prior testimony was not accurate, and he has not shown how an earlier disclosure would have made any difference in this respect.

Platt also argues that he was prejudiced by the untimely disclosure because he had to question three of the State's most important witnesses without a "correct" version of events as relayed in the first interview. But this claim is vague and unsupported. Platt does not identify which witnesses he considers to be "most important." But more importantly, he does he show how he would have examined these witnesses differently had the recording been disclosed sooner.[5]

---

[5] In one part of his brief, Platt notes that the State called five witnesses after lunch (after he listened to the recording), lists four witnesses ("Detective

Platt contends that he was prejudiced by the trial court's failure to "remedy the situation with the jury" despite having "promised" to do so.[6] In support of this argument, Platt relies on *Lee v. State*, 306 Ga. 663 (832 SE2d 851) (2019), where this Court stated that a trial court acts within its discretion to deny a motion for mistrial "when it provides adequate curative instructions to the jury to cure any prejudice stemming from the introduction of the improper evidence." Id. at 669. But as already made clear, Platt has demonstrated no prejudice resulting from the late disclosure of the recording; instead, the recording seemed to help his defense and he has not shown any harm from the delayed disclosure.

Platt next relies on the State's apparent lack of opposition to a mistrial as evidence that the trial court should have granted one.

Snider, a GBI crime lab tools examiner, Plair, and Detective Howard"), and then states "the newly-disclosed recording impacted all three." Even assuming Platt was referring to Detective Snider, Detective Howard, and Plair as the "three most important" witnesses, he does not explain what line of questioning he would have pursued had he known about the recording sooner. And as discussed, he was able to use the recording to impeach Detective Howard.

[6] In his brief, Platt cites the trial court's question about whether it should tell the jury the "truth" about the recording, but there is nothing in this exchange to show that it promised some sort of curative instruction.

21

Platt seems to focus on the prosecutor's response to whether it requested the court deny the motion for mistrial. The prosecutor did not finish her sentence before the trial court denied the motion, so it is not entirely clear what position the prosecutor was taking. But even if the prosecutor's statement is read as an apparent lack of objection, this does not establish that a mistrial was necessary. At most, the prosecutor's statements show her acknowledgement of the fact that the court *could* grant a mistrial; those statements fell short of showing that the court was required to grant one. See *Hightower v. State*, 315 Ga. 399, 404 (2) (883 SE2d 335) (2023) (simply because "reasonable" minds may differ about whether other alternatives are proper is not dispositive of whether a trial court abused its discretion in deciding whether to grant a mistrial). We conclude that Platt has failed to show that a mistrial was necessary to preserve his right to a fair trial.

(ii) *Even if the court abused its discretion in denying Platt a continuance, he has not shown harm to warrant a new trial.*

Platt alternatively argues that the trial court should have at

least granted his unopposed request for a continuance. But even if the trial court abused its discretion in denying that request, Platt cannot obtain a new trial unless he shows harm. See *Harris v. State*, 309 Ga. 599, 609 (3) (847 SE2d 563) (2020). Platt argues that he needed more time to study the recording and prepare, but he makes no showing how additional time would have benefitted him. See *Phoenix v. State*, 304 Ga. 785, 789 (2) (822 SE2d 195) (2018) ("To show harm, a party is required to specifically identify what other evidence or witnesses he would have put forth in his defense if his counsel had been given more time to prepare; speculation and conjecture are not enough." (citation and punctuation omitted)). Moreover, as discussed above, Platt demonstrated no prejudice from the untimely disclosure of the recording, as the recording seemed to help, rather than harm, Platt's defense. Because Platt has failed to show how any additional time to prepare harmed him, this argument fails.[7]

---

[7] Although the claims of untimely disclosure do not warrant reversal, we do not condone the State's failure to comply with its legal obligations.

23

3. Platt argues that the prosecutor violated OCGA § 17-8-75 by "identifying" him for three witnesses, and the trial court erred by failing to take some curative action. From a review of the record, it appears that the witnesses had an obstructed view of the defense table where Platt was sitting, and the prosecutor attempted to point out Platt's location in the courtroom. The prosecutor did nothing more than say where Platt was located.

OCGA § 17-8-75 provides:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

We are dubious that the prosecutor's actions were "statements of prejudicial matters" triggering a requirement for the trial court to take curative action under OCGA § 17-8-75. The jury was no doubt well aware that Platt was on trial and was sitting at the defense table. There is no indication that the prosecutor did anything more

24

than to make sure witnesses knew where Platt was.

But even if this amounted to a violation of OCGA § 17-8-75, any error in failing to prevent the prosecutor from making continued "identifications" of Platt or issuing a curative instruction was harmless.

> [A] trial court's error in not fulfilling its duty under OCGA § 17-8-75 is subject to harmless error analysis. For nonconstitutional harmless error, the State has the burden to show that it was highly probable that the error did not contribute to the verdict.

*Caldwell v. State*, 313 Ga. 640, 648 (2) (872 SE2d 712) (2022) (citations and punctuation omitted).

Here, any error was harmless given the strong evidence of Platt's guilt. Even setting aside Platt's second recorded interview in which he admitted participating in the armed robbery, other evidence showed that Platt shot Jones or, at the very least, participated in the armed robbery. Plair testified that Platt said he shot the victim during a robbery when Platt's face covering fell off and allowed him to see Platt. Bruce Coleman also heard Duncan and Bond talk on the day of the shooting about a planning a "lick," or

25

robbery, and when he saw them afterward, he heard from Platt and Bond that they carried out the robbery and "probably" killed someone. Miriam Brown and Platt's sister testified that on the day of the shooting, Platt, Duncan, Bond, and Plair were playing with a gun and wearing clothing that was later recovered from the same field where a safe appearing to belong to the victim was also found. Given the strength of the evidence, and the jury's awareness that Platt was on trial and was sitting at the defense table, it is highly probable that the prosecutor's actions in pointing out Platt as the defendant to witnesses did not contribute to the jury's verdict.

4.    Platt next argues that the cumulative prejudice from the trial court's errors warranted a new trial. We disagree.

To establish cumulative error, Platt must establish that "at least two errors were committed in the course of the trial and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [him] a fundamentally fair trial." *Huff v. State*, 315 Ga. 558, 567-568 (6) (883 SE2d 773) (2023) (citation and punctuation omitted). Above, we

assume, without deciding, that the trial court may have erred in failing to grant Platt a continuance related to the State's untimely disclosure that Platt's first custodial interview had been recorded and in failing to take some curative action with respect to the prosecutor's identification of Platt to witnesses. As explained above, these errors produced very little, if any, harm. Therefore, given the strength of the evidence, even if these assumed errors could be considered cumulatively, the cumulative prejudice did not deny Platt a fair trial.

*Judgment affirmed. All the Justices concur.*