NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 11, 2024

S24A0101. FORD v. THE STATE.

PETERSON, Presiding Justice.

William Jordan Ford appeals his convictions related to the shooting death of Travron Gill.[1] On appeal, Jordan argues that the evidence was insufficient to support his convictions for malice murder and armed robbery. He also argues that the trial court erred

---

[1] Gill was killed on August 4, 2017. In December 2017, a Fulton County grand jury indicted Ford for malice murder (Count 1), three counts of felony murder (Counts 2-4, predicated on armed robbery, aggravated assault, and possession of a firearm by a first offender probationer), armed robbery (Count 5), aggravated assault with a deadly weapon (Count 6), possession of a firearm during the commission of a felony (Count 7), and possession of a firearm by a first offender probationer (Count 8). At a March 2019 trial, the jury found Ford guilty on all counts. The trial court sentenced Ford to life in prison without the possibility of parole on Count 1, a consecutive life sentence on Count 5, a five-year term on Count 7 consecutive to Count 5, and a five-year term on Count 8 consecutive to Count 7. The remaining counts were merged or vacated by operation of law. Ford filed a timely motion for new trial, which he later amended. The trial court denied Ford's motion for new trial in June 2023, and he timely appealed. His appeal was docketed to this Court's term beginning in December 2023 and submitted for a decision on the briefs.

in allowing a forensic witness to testify about aspects of a blood test that the witness did not perform and that the court should have granted him a mistrial because the forensic witness was not timely disclosed as a witness. Ford also argues that the trial court erred in admitting certain exhibits into evidence because they were not properly authenticated. We conclude that the evidence was sufficient to support Ford's convictions, the trial court did not err in allowing the forensic witness to testify or in denying Ford's mistrial motion, and any error in admitting the exhibits was harmless. Therefore, we affirm.

The trial evidence showed the following. Travron Gill (also known as Travion Gill) operated a "trap house," from which he sold large quantities of high-grade marijuana.[2] On August 4, 2017, Ford reached out to Wilbert "Ola" Stephenson, a friend of Gill's who also sold drugs. Ford went to Stephenson's workplace driving a Ford

---

[2] Because this case turns on an assessment of whether an error was harmless, we lay out the evidence as reasonable jurors would have viewed it rather than in the light most favorable to the jury's verdicts. See *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022).

Fusion and told Stephenson that he wanted to buy a pound of marijuana and that he had a firearm for sale. Stephenson was not interested in the firearm and did not have marijuana to sell, but he directed Ford to Gill. Stephenson reached out to Gill to let him know a "white boy" was on his way to the trap house.

Around that time, Makeith Riggins was renovating a house located across the street from the trap house. Riggins testified that he encountered a white male later identified as Ford. Ford pulled into the driveway of the house Riggins was working on, got out of his car, and was "looking kind of crazy." Ford said he was looking for an "ounce." Riggins said that Ford did not look like a "weed smoker, he looked like he wanted something else." Riggins knew Gill sold only marijuana, so he directed Ford to a different location. Ford left, but Riggins saw Ford driving up and down the road a few more times.

Ford contacted Stephenson, saying he could not find the trap house, and Stephenson sent Ford a picture of the house around 6:20 p.m. Ford confirmed with Stephenson that he had arrived at the

3

house. Stephenson and Gill were on the phone at the time, and Gill told Stephenson that Stephenson's "buddy" was there. Stephenson heard Gill "fixing up the bags" before he hung up.

Riggins saw Ford back his car onto the driveway of the trap house and enter it, and Riggins heard a gunshot while Ford was inside. About five minutes later, Riggins saw Ford exit the house, throw a black bag into the trunk of his car, and drive away quickly. The house Riggins had been renovating that day had security cameras. He obtained the surveillance video and provided it to the police. The recording, which was played for the jury, showed Ford talking to Riggins, backing into the trap house driveway at 6:23 p.m., and leaving the house at 6:28 p.m.

Stephenson subsequently tried to call Gill and became worried when he could not reach him. Stephenson then tried to contact Ford, calling him, sending him text messages, and reaching out on Instagram. At a certain point, Stephenson's calls to Ford would not go through and he was blocked on Ford's Instagram.

The next day, Gill's girlfriend, Brittani Tarver, went to the trap

house because he had not responded to any of her messages. When she found Gill in the house, unresponsive, she called 911. Police responded and found Gill lying on the kitchen floor with a gunshot wound to his head. Police also saw blood on an interior doorknob, a cartridge casing next to Gill's leg, and a bullet in the crevice between the stove and a kitchen cabinet. Police collected the casing and bullet for evidence. Police also found marijuana and a digital scale in the kitchen. Police also recovered more than $900 in cash from Gill.

Gill was pronounced dead at the scene and his body was transported to a medical examiner, who performed an autopsy that same day. The medical examiner determined that Gill died from a gunshot wound to the head and testified that the fatal gunshot entered behind Gill's left ear and exited to the right of his eyebrow. The medical examiner also testified that the condition of Gill's body was consistent with Gill having been shot between 6:15 p.m. and 6:30 p.m. on the day before.

Based on their investigations, police questioned Stephenson, who told them about his interactions with Ford and provided a

picture of Ford. Police confirmed Ford's identity and learned that he had a 2016 grey Ford Fusion registered in his name. Ford was on first-offender probation at the time.

Police went to Ford's workplace to execute an arrest warrant. When approached by police, Ford attempted to flee. Ford was ultimately arrested, and the clothing and shoes he was wearing at the time were submitted for testing by the GBI. The testing of Ford's jeans revealed the presence of gunshot residue, and one of his sneakers had blood on it that matched Gill's DNA. Police later searched Ford's car and found a 9mm Beretta under the driver's seat. Police also found a bag of marijuana next to a black bag in the trunk. A forensic analysis revealed that the recovered gun fired the spent casing found next to Gill's body and the bullet recovered next to the stove in the kitchen. Ford argues that under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), the evidence was insufficient to support his convictions for malice murder and armed robbery. We disagree.

When evaluating the legal sufficiency of evidence, we view the evidence in the light most favorable to the verdict and inquire whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson*, 443 U.S. at 319. "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019) (citation and punctuation omitted).

The evidence described above was plainly sufficient to support Ford's murder conviction. There was testimony that Ford went to Gill's house to purchase marijuana, Gill confirmed to Stephenson that Ford had arrived, and Riggins saw Ford enter Gill's house and heard a gunshot shortly thereafter. Surveillance video footage played for the jury confirmed Ford's presence at Gill's house at the time of the shooting. Forensic evidence showed that the gun recovered from Ford's vehicle was the murder weapon and that one of his sneakers had blood on it that matched Gill's DNA. Ford's

7

conduct following the shooting also showed a consciousness of guilt. Ford had been in frequent contact with Stephenson until he arrived at Gill's house but subsequently did not respond to Stephenson's messages and blocked him on social media. He also attempted to flee when police approached him. See *Jenkins v. State*, 313 Ga. 81, 89 (3) (868 SE2d 205) (2022) (an accused's flight, resistance to arrest, concealment, and other related conduct "is admissible as evidence of consciousness of guilt for the charged offense, and thus of guilt itself" (citations and punctuation omitted)). This evidence far exceeds the threshold for sufficiency under *Jackson*.

Ford argues that he countered the State's evidence that he shot Gill with malice, because there was money left behind at the scene of the crime. But as we have stated before, "[i]t is for a jury to determine from all the facts and circumstances whether a killing is intentional and malicious." *Benton v. State*, 305 Ga. 242, 244 (1) (a) (824 SE2d 322) (2019). Because the evidence showed that Gill was shot in the head while Ford was in the house and that Ford left the scene without rendering aid, the jury was authorized to conclude

8

that Ford was guilty of the crime of malice murder. See, e.g., *Benton*, 305 Ga. at 244 (1) (a) (evidence sufficient to support finding of malice murder where, among other things, appellant left the victim after shooting him); *Moran v. State*, 302 Ga. 162, 163 (1) (b) (805 SE2d 856) (2017) (jury authorized to find evidence of malice where, among other things, the defendant shot the victim in the back of the head).

Ford argues that the evidence was insufficient to support his armed robbery conviction solely because the State did not prove he took anything from Gill when cash and other items of value were found at Gill's house following the shooting, and the State could not prove that the marijuana found in his trunk was taken from Gill. His argument fails.

The evidence was sufficient to support a finding that Ford at least took marijuana. The evidence clearly established that Ford was attempting to acquire marijuana, and he went to Gill's house for that purpose. Stephenson said that when Gill confirmed Ford's arrival, it sounded like Gill was "fixing up the bags." The evidence shows that after Gill was shot in the kitchen, which contained

9

marijuana and a digital scale, Ford left Gill's house with a black bag and placed it in his trunk. When Ford was later arrested, marijuana was found in the trunk of Ford's vehicle and located next to a black bag. Although there is no specific evidence that the marijuana found in Ford's vehicle was similar to the marijuana that Gill sold, a jury could infer from the circumstances, especially Ford leaving Gill's residence with a black bag, that Ford at least took marijuana from Gill. Accordingly, Ford's argument to the contrary fails. See *Thornton v. State*, 312 Ga. 224, 227-228 (1) (862 SE2d 113) (2021) (rejecting argument that there was no evidence showing when or how the defendant obtained the victim's property because the defendant had a knife when he encountered the victim and jury could conclude from evidence whether he obtained property by armed robbery); *Waller v. State*, 311 Ga. 517, 522-523 (2) (a) (858 SE2d 683) (2021) (based on evidence presented, the jury was authorized to make the reasonable inference that the defendant took the victim's property).

2. Ford next argues that the trial court erred in allowing

10

forensic technician Angela McCray to testify about a "blood stain card" that was later used to compare Gill's blood against that collected from Ford's sneaker. McCray testified that she was present for the autopsy and personally drew Gill's blood and placed blood droplets on the blood stain card. Ford argues that McCray's testimony was based on hearsay testimony, pointing to her response to questioning about how she knew she had some personal involvement with the blood stain card. The prosecutor asked McCray, "How do you know that you had any connection with the autopsy regarding [the blood stain card]?" McCray responded, "Well, I know because I was able to look over the case before I came here, and I saw that I was the assigned technician on that case, meaning that I assisted the pathologist with the autopsy on that case."

Ford's hearsay claim is meritless. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). But McCray did not testify about something someone else told her; instead, she testified about

11

what she personally did. See OCGA § 24-6-602 (a witness's own testimony may prove that she has personal knowledge of the matter at issue); see also *Brown v. State*, 314 Ga. 193, 200 (3) (875 SE2d 784) (2022) (witnesses' knowledge of shooting was not based on hearsay where they were present at crime scene and described their observations of shooting); *Kirby v. State*, 304 Ga. 472, 478 (3) (b) (819 SE2d 468) (2018) (reviewing case law that a witness can testify only as to that of which the witness has personal knowledge and that relaying information told to the testifying witness constitutes inadmissible hearsay).

Ford also claims that McCray's testimony constituted "surrogate testimony" under *Bullcoming v. New Mexico*, 564 U.S. 647 (131 SCt 2705, 180 LE2d 610) (2011). There, the United States Supreme Court held that testimony about a lab test by a witness who did not perform or observe the test reported in the certification violates the Sixth Amendment's Confrontation Clause. But McCray testified that she personally drew the blood and placed it on the blood stain card, and McCray provided no testimony about the

12

results of any tests run on that blood stain card. Therefore, Ford's *Bullcoming* claim fails.

3. Ford alternatively argues that the court should have granted his request for a mistrial because McCray was not identified on any of the State's witness lists or in discovery. We disagree.

A trial court has broad discretion as to whether to grant a mistrial, and we will not disturb a court's decision not to grant one unless there is a showing that a mistrial was essential to preserve a party's right to a fair trial. See *Jordan v. State*, 305 Ga. 12, 15 (2) (823 SE2d 336) (2019); *Ragan v. State*, 299 Ga. 828, 833-834 (3) (792 SE2d 342) (2016). A trial court has the discretion to fashion an appropriate remedy for a violation of the discovery statutes, including whether to grant a mistrial. See OCGA § 17-16-6; *Tubbs v. State*, 276 Ga. 751, 753-754 (3) (583 SE2d 853) (2003). Ford fails to show that a mistrial was necessary to preserve his right to a fair trial.

On the fourth day of his trial, the State notified Ford just after lunch that it intended to call McCray in order to establish the chain

of custody for the blood stain card. McCray was not the next witness to be called. Ford moved for a mistrial because he was not provided McCray's name prior to trial, but he made no request for a continuance or any other remedy for the purported discovery violation. The trial court denied his mistrial motion without explanation.

Ford argues that the court should have granted him a mistrial because he was not prepared to cross-examine McCray, as he did not even know of her existence before trial. But McCray's testimony was very brief, limited only to her description of having collected blood from Gill and placing it on the blood stain card. Ford makes no showing of how advance notice of McCray's testimony would have made any difference with respect to his cross-examination of her. He also argues that, due to the lack of notice, he was unable to investigate the collection of the blood stain card prior to trial. He makes no claim, however, that he was unaware that blood was collected from Gill, placed on a blood stain card, or tested. In other words, he has not shown how McCray's omission from witness lists

precluded him from investigating the blood stain card, nor has he shown how additional time would have helped his defense. Ford's arguments about how he was harmed by the omission of McCray's name from the State's witness list are purely speculative and are insufficient to show that the denial of a mistrial motion was an abuse of discretion. See *Platt v. State*, ___ Ga. ___, ___ (2) (i) (__ SE2d __) (2024) (rejecting claim that the trial court erred in denying motion for mistrial based on State's failure to disclose the existence of a recording of a statement by the defendant, because the defendant did not show how an earlier disclosure would have benefitted him, and his suggestion that he would have cross-examined witnesses differently if he was aware of the recording was "vague and unsupported").

4. Ford argues that the trial court erred in admitting into evidence exhibits containing cellphone data extracted from four cellphones. Ford argues that the exhibits were not properly authenticated. But any error in admitting the exhibits was harmless.

15

At trial, Detective Mark Taylor testified that he was responsible for downloading or extracting data from mobile devices. The State tendered into evidence State's Exhibits 90 through 93, and Detective Taylor identified the exhibits as thumb drives containing data extracted from certain cellphones, and the labels on the thumb drives corresponded to the owner of the cell phone. The thumb drives were labeled "Ford Dump", "Vic Dump," "Ola Stephenson," and "Tarver."

Ford objected based on lack of foundation and failure to establish a chain of custody because "we do not have the phones to know which actual phones were dumped." Detective Taylor testified that he reviewed the exhibits, and they contained the data extracted from the devices. He testified that he received the actual phones from the lead detective and took photographs of the phones, including the identification numbers for each. The court admitted the exhibits, overruling Ford's objections based on hearsay and chain of custody grounds.

On appeal, Ford argues that the State failed to authenticate

16

Exhibits 90 through 93 properly because Detective Taylor had no personal knowledge about the ownership of the cell phones and his knowledge was based on hearsay information gained from the lead detective. But regardless of whether Exhibits 90 through 93 were properly authenticated, any error in their admission was harmless.

"The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kirby v. State*, 304 Ga. 472, 478 (3) (c) (819 SE2d 468) (2018) (citation and punctuation omitted). The State bears the burden of showing harmlessness. *Bozzie v. State*, 302 Ga. 704, 708 (2) (a) (808 SE2d 671) (2017).

Any error here was harmless because the evidence of guilt was overwhelming. The surveillance video shows Ford inside Gill's house between 6:23 p.m. and 6:28 p.m. on the day of Gill's death, and the medical examiner testified that the condition of Gill's body was consistent with a time of death between 6:15 p.m. and 6:30 p.m. Riggins said that after he saw Ford go inside Gill's house, he heard a gunshot and then saw Ford leave. When Ford was arrested, the

17

murder weapon was found in his car, and one of his shoes had blood on it that had the presence of Gill's DNA.

Ford argues that the data contained in Exhibit 90 through 93 were critical to the State's case because it corroborated important aspects of Stephenson's testimony, including that Ford went to Gill's house shortly before 6:30 p.m. on the day of Gill's death and that Stephenson sent Ford a text message containing a picture of Gill's house when Ford was lost. Ford argues that the State needed to corroborate Stephenson's testimony because he was arguably an accomplice based on conspiring with Ford to arrange a drug transaction with Gill.

But even if this were true, other evidence corroborated Stephenson's testimony: surveillance video footage showed that Ford arrived at Gill's house around 6:23 p.m. and Riggins testified that Ford was driving around looking for drugs. Therefore, the exhibits were not critical to the State's case. Under these circumstances, it is highly probable that any error in admitting the exhibits did not contribute to the verdicts.

*Judgment affirmed. All the Justices concur.*